**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

Rahman A. Foreman,

                Plaintiff,                         Court File No. 16-CV-03948

v.                                     The Honorable John J. Tharp Jr.

Soo Line Railroad d/b/a Canadian       ORAL ARGUMENT REQUESTED IF
Pacific Railway[1]                   COURT DEEMS NECESSARY

              Defendant.

---

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Comes now Plaintiff, Rahman Foreman, pursuant to Local Rule 56.1, and files this, his Statement of Undisputed Material Facts as follows:

### A.    MR. FOREMAN'S EMPLOYMENT HISTORY

1.  Mr. Foreman, who is an African American, was hired as a conductor trainee by Soo Line's Bensenville division on August 5, 2002. (*See Exhibit 2:* Foreman 123-125).

2.  As a train conductor, Foreman was responsible for supervising and ensuring the safe movement of trains. (*See Exhibit 2:* Foreman 125-126).

### B.    MR. FOREMAN'S HISTORY OF DISCRIMINATION COMPLAINTS

3.  Foreman filed an initial complaint based upon race discrimination with the Equal Employment Opportunity Commission (hereafter "EEOC") On May 4, 2011. (*See Plaintiff's* Tab AA at pp. 1).

---

[1] The proper entity name of Defendant is Soo Line Railroad Company d/b/a Canadian Pacific.

4. Managers were aware of the previous lawsuit filed in 2012 because there was talk of the lawsuit amongst the employees. (*See Exhibit 2:* Foreman 336-337).

## C.    THE MANAGEMENT OF CP PROPAGATED A DISCRIMINATORY AND RETALIATORY WORK ENVIRONMENT

5. Following the settlement there was a culture amongst upper management where former plaintiffs to the harassment lawsuit were singled out for harsher disciplinary action as opposed to non-plaintiff employees. (*See Exhibit 3:* Coleman 24:20-23).

6. Managers actively followed Foreman around trying to find a reason to discipline him to facilitate the termination of his employment. (*See Exhibit 2:* Foreman 168:16-22). After his original EEOC was filed Defendant instigated various false allegations against Foreman that he was required to sign waivers for so that he could keep his job. (*See* Exhibit 2: Foreman 150:16-18; 172:6-21; 194:2-195:5; 203:12-21; 207:5).

## D.    SOO LINE'S DISCIPLINARY PROCEDURES

7. Soo Line's 5612-US Discipline Policy was revised June 15, 2013, following the settlement of the lawsuit. (*See Exhibit 3:* Coleman 122:15-16).

8. Steve Cork was Superintendent of Defendant until he voluntarily left the position in September of 2013. (*See Exhibit 12:* Cork 10). The general procedure for when a manager observes a rule violation is 1) to confront the employee about what they have or have not done, 2) both the employee and witness go to the office and create a written statement regarding the incident, and 3) the superintendent weighs the issue of whether to issue hearing or offer waiver. (*See Exhibit 12:* Cork 25:6-22).

9. Following the initial confrontation with the employee, the manager would interview other witnesses in the surrounding area outside the presence of the alleged rule violator. *See* (*Exhibit 12:* Cork 41:5-24). Following the interviews, the employee may be dismissed

from service immediately and crew members informed they may be called as witnesses. *Id.*

10. Any written statements taken would be saved for potential use at an investigatory hearing. (*See Exhibit 12:* Cork 27:19-23).  Written statement should include date, time, location, temperature, visibility, type of operating method, engineer, conductor, brakeman, and other employees around. *Id.*

11. The manager is also required to inform the superintendent of the alleged violation and the superintendent determines if the incident escalates to notifying the general manager or vice president. (*See Exhibit 12:* Cork 13:4-16).  The Discipline Policy determines whether or not an investigative hearing will occur. (*See Exhibit 12:* Cork 14:1-3).

12. It was typical to investigate the alleged rule violation and consult with Human Resources to inquire where the employee stood in the discipline ladder before issuing notice of investigative hearing. (*See Exhibit 12:* Cork 21:10-14).

13. When determining discipline, Defendant may only review an employee's record for infractions occurring within 24 months of compensated service of a previous infraction. (*See Exhibit 4:* Coleman Dep Ex. 4*).* The underlying principle is that the manager must be able to evaluate the employee's on the job behavior and/or performance during the 24-month time period.  *Id.*

E.     **DEFENDANT'S ALLEGATION THAT FOREMAN COMMITTED VIOLATION OF RULE T-8 IS PRETEXTUAL**

14. New trainmasters should be supervised for 4-6 weeks to ensure they are competent of their duties. (*See Exhibit 12:* Cork 61:11-14). Trainmaster training consists of observing a certain number of efficiency tests with another manager. (*See Exhibit 5:* Granfeldt 59:16-17). Feliciano received no training following his promotion. (*See Exhibit 8:* Feliciano

54:19-24).  He was never subject to classroom or online training for any efficiency tests or safety rules tests. (*See Exhibit 8:* Feliciano 64:1-16).

15. On May 8, 2014 Feliciano was almost to his fourth week as a trainmaster. (*See Exhibit 8:* Feliciano 54:16-18).  Around 10:30 AM Feliciano was driving in a truck and witnessed a train start to move and decided this was a good opportunity to conduct a shove movement test. (*See Exhibit 8:* Feliciano 205:18-23). As the train cars passed him, Feliciano observed Foreman riding a car. (*See Exhibit 8:* Feliciano 206:2-4).  Mr. Feliciano decided to speak to Foreman regarding the way he had been riding the tank car. (*See Exhibit 8:* Feliciano 206:24-25).

16. During this time Feliciano was monitoring three different radio frequencies at once. (*See Exhibit 8:* Feliciano 132:1-7).  Feliciano was supposed to be monitoring the frequency Foreman was using during the shove test, but changed to a different frequency when he bumped the radio with his knee. (*See Exhibit 8:* Feliciano 132:18-21).  Feliciano never failed Foreman for an efficiency test nor entered any test for Foreman into the CAM system. (*See Exhibit 8:* Feliciano 104:17-20; *See Also Exhibit 5:* Granfeldt 181-182).

17. During this time, because Foreman was the conductor the train could not move without his express permission.  (*See Exhibit 2:* Foreman 247:2-3).

18. In order to speak to speak to Foreman, Feliciano kept driving alongside the train to intercept Foreman over the crossing. (*See Exhibit 8:* Feliciano 210:13-15).  While driving he lost sight Foreman. (*See Exhibit 8:* Feliciano 210:18-21).

19. Foreman approached Feliciano. (*See Exhibit 8:* Feliciano 244:18-20).  Feliciano spoke with Foreman because he had a question about a rule or regulation. (*See Exhibit 8:* Feliciano 266:8-9).

20. Feliciano inquired of Foreman how he had gotten to the north side of the train without three-point protection. (*See Exhibit 2:* Foreman 258). Three-point protection means put the reverse in neutral, apply the brakes, and generate field button that shuts down power to train. (*See Exhibit 3:* Coleman 182:2-8). Foreman, not understanding the inquiry, told Feliciano that he crossed the train. (*See Exhibit 6:* Hearing Transcript 17:5-10).

21. If Feliciano had actually believed Foreman crossed the equipment while moving Feliciano was required to immediately removed Foreman from service. (*See Exhibit 5:* Granfeldt 115-116, 178-179).

22. Feliciano did not remove Foreman from service and dismissed following incident. (*See Exhibit 5:* Granfeldt 112:23-24).

## F. SOO LINE'S DID NOT INVESTIGATE THE ALLEGATIONS

23. Foreman was not asked by Feliciano or anyone else to give or writeup a statement regarding the alleged rule violation. (*See Defendant's* Dittrich-Bigley Dec. as Tab B).

24. Following his conversation with Foreman, Feliciano never questioned the engineer to verify if train was stopped or moving. (*See Exhibit 8:* Feliciano 136:21-25). Never talked to the Helper on site Bill Lenoir about what he had seen. (*See Exhibit 8:* Feliciano 139:1-2). Never interviewed any other witnesses on the scene regarding what they saw. (*See Exhibit 8:* Feliciano 143:3-5).

25. Feliciano never visited Soo Line's communications person Robert Butts to get a download of Foreman's radio frequency, for the period when he was switched to the wrong channel. (*See Exhibit 8:* Feliciano 161:5-13). Feliciano never download the locomotive engine. (*See Exhibit 8:* Feliciano 169:16-171:1). An engine download records whether a train is moving, how fast it is goings, what lights are on, etc. (*See Exhibit 12:* Cork 138:2-5).

26. At no point on May 8, 2014, did Feliciano explain that he hadn't witnessed Foreman cross over moving equipment with his own eyes. (*See Exhibit 8:* Feliciano 149:8-10).

27. Hearing officer John Granfeldt was assigned and he emailed Feliciano and asked him if he actually saw Foreman cross between a moving train. (*See Exhibit 8:* Feliciano 94:25-95:5). Feliciano never responded to this email and it was never followed up prior to the hearing. (*See Exhibit 8:* Feliciano 159:2-9).

## G. THE HEARING FOR FOREMAN WAS A SHAM

28. Feliciano was aware that Foreman was involved with a prior lawsuit against Defendant. (*See Exhibit 8:* Feliciano 72-73).

29. The hearing officer for an investigation under the CBA is a representative of CP. (*See Exhibit 5:* Granfeldt 145:16-17). The job of a hearing officer is to listen to the evidence presented, listens to the facts presented by both sides, and come to a fair determination. (*See Exhibit 5:* Granfeldt 161:23-162:5). Hearing officers are required to be fair and impartial in carrying out their duties. (*See Exhibit 5:* Granfeldt 147:14-17). To be fair and impartial, they must allow all parties to participate and fully explain their version of the facts. (*See Exhibit 5:* Granfeldt 151:17-23).

30. Facts come into the record from the witness, accused employee, and union rep, not the hearing officer. (*See Exhibit 5:* Granfeldt 146:23-147:1). However, the hearing officer may summon witnesses not originally listed in the complaint to testify at the hearing by issuing a side letter to the witness. (*See Exhibit 5:* Cork 55:18-23; 8-16). Foreman's hearing officer Granfeldt did not require any other witnesses than Feliciano. (*See Exhibit 5:* Granfeldt 261:19-25).

31. The burden of proof at disciplinary hearings is on the carrier. (*See Exhibit 4:* Coleman Dep Exhibit. 2 (Labor Agreement) pg. 22).

32. Feliciano testified at the Hearing he did not see Foreman move between a moving train. (*See exhibit 8:* Feliciano 91:7-18; *See also Ex. 6* 21:15-20).

33. Granfeldt immediately validated Feliciano's version as the "correct" version and judged Foreman guilty of violating Rule T-8, before Foreman even had the opportunity to present a single piece of evidence in his defense. (*See Exhibit 5:* Granfeldt 273:21-25; 275:24-276:6).

34. At the hearing, when Foreman testified that he had stopped the train because his Helper (Lenoir) wasn't ready for the shove. (*See Exhibit 5:* Granfeldt 218:17-22; *See Also Exhibit 6:* hearing transcript 27:15-17). It was during this stop that he took the opportunity cross the train. *Id.*

35. Feliciano has not been involved in any investigations since Foreman. (*See Exhibit 8:* Feliciano 28:2-5). In fact, Feliciano was demoted less than two months after the hearing in September 2014 for failure to comply with his trainmaster responsibilities. (*See Exhibit 8:* Feliciano 125:6-21).

36. Hearing Officer Granfeldt argued with the Union representative at the hearing. (*See Exhibit 5:* Granfeldt 214:17-25; 204:2-8; *See also Exhibit 6:* Hearing Transcript: 20:16-22:25; 23:20-24:26; 39:5-43:6).

37. Crystal Reports are created date employee is hired and contains records of training, incidents, and efficiency tests. (*See Exhibit 5:* Granfeldt 245:13-19, *See Also Exhibit 7*).

38. Defendant took into consideration the entire Crystal Report when making its determination to terminate Mr. Foreman. (*See Exhibit 5:* Granfeldt 237:3-11; 243:4-244:13; *See Also Exhibit 7*).

39. Pursuant to the Defendant's own rules and regulations the Defendant could only take into consideration discipline taken against Foreman for the last 24-months. (*See Ex 4:*

*Coleman Deposition Exhibit 4).* However, the Crystal reports had information on from 2010 and 2012. (*See* Exhibit 7, page 6). The allegation from 2012 and one from 2013 were informal and a positive action plan, both of which are not discipline, therefore, the Discipline record should have only included the May and August 2013 matters. *Id.*

40. The only other person that Defendant was able to identify who had been disciplined for the same violation of Foreman was also an African American male. *See Exhibit 13 Answer to Interrogatory 11.*

Dated: September 14, 2017                                    By: /S/ Cynthia M Rote

                                                                                    Cynthia M. Rote

Delaney Law, PC
Firm No.: 44350.
444 N. Wabash Ave., Ste. 300
Chicago, Illinois 60611
(312) 276-0263

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

Rahman A. Foreman,

        Plaintiff,                        Court File No. 16-CV-03948

v.                                     The Honorable John J. Tharp Jr.

Soo Line Railroad d/b/a Canadian        ORAL ARGUMENT REQUESTED IF
Pacific Railway[1]                      COURT DEEMS NECESSARY

        Defendant.

---

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Comes now Plaintiff, Rahman Foreman, pursuant to Local Rule 56.1, and files this, his Statement

of Undisputed Material Facts as follows:

### A.    MR. FOREMAN'S EMPLOYMENT HISTORY

1. Mr. Foreman, who is an African American, was hired as a conductor trainee by Soo

   Line's Bensenville division on August 5, 2002. (*See Exhibit 2:* Foreman 123-125).

2. As a train conductor, Foreman was responsible for supervising and ensuring the safe

   movement of trains. (*See Exhibit 2:* Foreman 125-126).

### B.    MR. FOREMAN'S HISTORY OF DISCRIMINATION COMPLAINTS

3. Foreman filed an initial complaint based upon race discrimination with the Equal

   Employment Opportunity Commission (hereafter "EEOC") On May 4, 2011. (*See

   Plaintiff's* Tab AA at pp. 1).

---

[1] The proper entity name of Defendant is Soo Line Railroad Company d/b/a Canadian Pacific.

4. Managers were aware of the previous lawsuit filed in 2012 because there was talk of the lawsuit amongst the employees. (*See Exhibit 2:* Foreman 336-337).

## C.   THE MANAGEMENT OF CP PROPAGATED A DISCRIMINATORY AND RETALIATORY WORK ENVIRONMENT

5. Following the settlement there was a culture amongst upper management where former plaintiffs to the harassment lawsuit were singled out for harsher disciplinary action as opposed to non-plaintiff employees. (*See Exhibit 3:* Coleman 24:20-23).

6. Managers actively followed Foreman around trying to find a reason to discipline him to facilitate the termination of his employment. (*See Exhibit 2:* Foreman 168:16-22). After his original EEOC was filed Defendant instigated various false allegations against Foreman that he was required to sign waivers for so that he could keep his job. (*See* Exhibit 2: Foreman 150:16-18; 172:6-21; 194:2-195:5; 203:12-21; 207:5).

## D.   SOO LINE'S DISCIPLINARY PROCEDURES

7. Soo Line's 5612-US Discipline Policy was revised June 15, 2013, following the settlement of the lawsuit. (*See Exhibit 3:* Coleman 122:15-16).

8. Steve Cork was Superintendent of Defendant until he voluntarily left the position in September of 2013. (*See Exhibit 12:* Cork 10). The general procedure for when a manager observes a rule violation is 1) to confront the employee about what they have or have not done, 2) both the employee and witness go to the office and create a written statement regarding the incident, and 3) the superintendent weighs the issue of whether to issue hearing or offer waiver. (*See Exhibit 12:* Cork 25:6-22).

9. Following the initial confrontation with the employee, the manager would interview other witnesses in the surrounding area outside the presence of the alleged rule violator. *See* (*Exhibit 12:* Cork 41:5-24). Following the interviews, the employee may be dismissed

2

from service immediately and crew members informed they may be called as witnesses. *Id*.

10. Any written statements taken would be saved for potential use at an investigatory hearing. (*See Exhibit 12:* Cork 27:19-23). Written statement should include date, time, location, temperature, visibility, type of operating method, engineer, conductor, brakeman, and other employees around. *Id*.

11. The manager is also required to inform the superintendent of the alleged violation and the superintendent determines if the incident escalates to notifying the general manager or vice president. (*See Exhibit 12:* Cork 13:4-16). The Discipline Policy determines whether or not an investigative hearing will occur. (*See Exhibit 12:* Cork 14:1-3).

12. It was typical to investigate the alleged rule violation and consult with Human Resources to inquire where the employee stood in the discipline ladder before issuing notice of investigative hearing. (*See Exhibit 12:* Cork 21:10-14).

13. When determining discipline, Defendant may only review an employee's record for infractions occurring within 24 months of compensated service of a previous infraction. (*See Exhibit 4:* Coleman Dep Ex. 4*)*. The underlying principle is that the manager must be able to evaluate the employee's on the job behavior and/or performance during the 24-month time period. *Id*.

## E. DEFENDANT'S ALLEGATION THAT FOREMAN COMMITTED VIOLATION OF RULE T-8 IS PRETEXTUAL

14. New trainmasters should be supervised for 4-6 weeks to ensure they are competent of their duties. (*See Exhibit 12:* Cork 61:11-14). Trainmaster training consists of observing a certain number of efficiency tests with another manager. (*See Exhibit 5:* Granfeldt 59:16-17). Feliciano received no training following his promotion. (*See Exhibit 8:* Feliciano

54:19-24).  He was never subject to classroom or online training for any efficiency tests or safety rules tests. (*See Exhibit 8:* Feliciano 64:1-16).

15. On May 8, 2014 Feliciano was almost to his fourth week as a trainmaster. (*See Exhibit 8:* Feliciano 54:16-18).  Around 10:30 AM Feliciano was driving in a truck and witnessed a train start to move and decided this was a good opportunity to conduct a shove movement test. (*See Exhibit 8:* Feliciano 205:18-23). As the train cars passed him, Feliciano observed Foreman riding a car. (*See Exhibit 8:* Feliciano 206:2-4).  Mr. Feliciano decided to speak to Foreman regarding the way he had been riding the tank car. (*See Exhibit 8:* Feliciano 206:24-25).

16. During this time Feliciano was monitoring three different radio frequencies at once. (*See Exhibit 8:* Feliciano 132:1-7).  Feliciano was supposed to be monitoring the frequency Foreman was using during the shove test, but changed to a different frequency when he bumped the radio with his knee. (*See Exhibit 8:* Feliciano 132:18-21).  Feliciano never failed Foreman for an efficiency test nor entered any test for Foreman into the CAM system. (*See Exhibit 8:* Feliciano 104:17-20; *See Also Exhibit 5:* Granfeldt 181-182).

17. During this time, because Foreman was the conductor the train could not move without his express permission.  (*See Exhibit 2:* Foreman 247:2-3).

18. In order to speak to speak to Foreman, Feliciano kept driving alongside the train to intercept Foreman over the crossing. (*See Exhibit 8:* Feliciano 210:13-15).  While driving he lost sight Foreman. (*See Exhibit 8:* Feliciano 210:18-21).

19. Foreman approached Feliciano. (*See Exhibit 8:* Feliciano 244:18-20).  Feliciano spoke with Foreman because he had a question about a rule or regulation. (*See Exhibit 8:* Feliciano 266:8-9).

20. Feliciano inquired of Foreman how he had gotten to the north side of the train without three-point protection. (*See Exhibit 2:* Foreman 258). Three-point protection means put the reverse in neutral, apply the brakes, and generate field button that shuts down power to train. (*See Exhibit 3:* Coleman 182:2-8). Foreman, not understanding the inquiry, told Feliciano that he crossed the train. (*See Exhibit 6:* Hearing Transcript 17:5-10).

21. If Feliciano had actually believed Foreman crossed the equipment while moving Feliciano was required to immediately removed Foreman from service. (*See Exhibit 5:* Granfeldt 115-116, 178-179).

22. Feliciano did not remove Foreman from service and dismissed following incident. (*See Exhibit 5:* Granfeldt 112:23-24).

## F.     SOO LINE'S DID NOT INVESTIGATE THE ALLEGATIONS

23. Foreman was not asked by Feliciano or anyone else to give or writeup a statement regarding the alleged rule violation. (*See Defendant's* Dittrich-Bigley Dec. as Tab B).

24. Following his conversation with Foreman, Feliciano never questioned the engineer to verify if train was stopped or moving. (*See Exhibit 8:* Feliciano 136:21-25). Never talked to the Helper on site Bill Lenoir about what he had seen. (*See Exhibit 8:* Feliciano 139:1-2). Never interviewed any other witnesses on the scene regarding what they saw. (*See Exhibit 8:* Feliciano 143:3-5).

25. Feliciano never visited Soo Line's communications person Robert Butts to get a download of Foreman's radio frequency, for the period when he was switched to the wrong channel. (*See Exhibit 8:* Feliciano 161:5-13). Feliciano never download the locomotive engine. (*See Exhibit 8:* Feliciano 169:16-171:1). An engine download records whether a train is moving, how fast it is goings, what lights are on, etc. (*See Exhibit 12:* Cork 138:2-5).

26. At no point on May 8, 2014, did Feliciano explain that he hadn't witnessed Foreman cross over moving equipment with his own eyes. (*See Exhibit 8:* Feliciano 149:8-10).

27. Hearing officer John Granfeldt was assigned and he emailed Feliciano and asked him if he actually saw Foreman cross between a moving train. (*See Exhibit 8:* Feliciano 94:25-95:5). Feliciano never responded to this email and it was never followed up prior to the hearing. (*See Exhibit 8:* Feliciano 159:2-9).

## G.    THE HEARING FOR FOREMAN WAS A SHAM

28. Feliciano was aware that Foreman was involved with a prior lawsuit against Defendant. (*See Exhibit 8:* Feliciano 72-73).

29. The hearing officer for an investigation under the CBA is a representative of CP. (*See Exhibit 5:* Granfeldt 145:16-17). The job of a hearing officer is to listen to the evidence presented, listens to the facts presented by both sides, and come to a fair determination. (*See Exhibit 5:* Granfeldt 161:23-162:5). Hearing officers are required to be fair and impartial in carrying out their duties. (*See Exhibit 5:* Granfeldt 147:14-17). To be fair and impartial, they must allow all parties to participate and fully explain their version of the facts. (*See Exhibit 5:* Granfeldt 151:17-23).

30. Facts come into the record from the witness, accused employee, and union rep, not the hearing officer. (*See Exhibit 5:* Granfeldt 146:23-147:1). However, the hearing officer may summon witnesses not originally listed in the complaint to testify at the hearing by issuing a side letter to the witness. (*See Exhibit 5:* Cork 55:18-23; 8-16). Foreman's hearing officer Granfeldt did not require any other witnesses than Feliciano. (*See Exhibit 5:* Granfeldt 261:19-25).

31. The burden of proof at disciplinary hearings is on the carrier. (*See Exhibit 4:* Coleman Dep Exhibit. 2 (Labor Agreement) pg. 22).

6

32. Feliciano testified at the Hearing he did not see Foreman move between a moving train. (*See exhibit 8:* Feliciano 91:7-18; *See also Ex. 6* 21:15-20).

33. Granfeldt immediately validated Feliciano's version as the "correct" version and judged Foreman guilty of violating Rule T-8, before Foreman even had the opportunity to present a single piece of evidence in his defense. (*See Exhibit 5:* Granfeldt 273:21-25; 275:24-276:6).

34. At the hearing, when Foreman testified that he had stopped the train because his Helper (Lenoir) wasn't ready for the shove. (*See Exhibit 5:* Granfeldt 218:17-22; *See Also Exhibit 6:* hearing transcript 27:15-17).  It was during this stop that he took the opportunity cross the train. *Id.*

35. Feliciano has not been involved in any investigations since Foreman. (*See Exhibit 8:* Feliciano 28:2-5).  In fact, Feliciano was demoted less than two months after the hearing in September 2014 for failure to comply with his trainmaster responsibilities. (*See Exhibit 8:* Feliciano 125:6-21).

36. Hearing Officer Granfeldt argued with the Union representative at the hearing. (*See Exhibit 5:* Granfeldt 214:17-25; 204:2-8;  *See also Exhibit 6:* Hearing Transcript: 20:16-22:25; 23:20-24:26; 39:5-43:6).

37. Crystal Reports are created date employee is hired and contains records of training, incidents, and efficiency tests. (*See Exhibit 5:* Granfeldt 245:13-19, *See Also Exhibit 7*).

38. Defendant took into consideration the entire Crystal Report when making its determination to terminate Mr. Foreman. (*See Exhibit 5:* Granfeldt 237:3-11; 243:4-244:13; *See Also Exhibit 7*).

39. Pursuant to the Defendant's own rules and regulations the Defendant could only take into consideration discipline taken against Foreman for the last 24-months.  (*See Ex 4:*

7

*Coleman Deposition Exhibit 4).* However, the Crystal reports had information on from 2010 and 2012. (*See* Exhibit 7, page 6). The allegation from 2012 and one from 2013 were informal and a positive action plan, both of which are not discipline, therefore, the Discipline record should have only included the May and August 2013 matters. *Id.*

40. The only other person that Defendant was able to identify who had been disciplined for the same violation of Foreman was also an African American male. *See Exhibit 13 Answer to Interrogatory 11.*


Dated: September 14, 2017                    By:  /S/ Cynthia M Rote
                                                  Cynthia M. Rote

Delaney Law, PC
Firm No.: 44350.
444 N. Wabash Ave., Ste. 300
Chicago, Illinois 60611
(312) 276-0263