## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

Rahman A. Foreman,

        Plaintiff,                              Court File No. 16-CV-03948

v.                                          The Honorable John J. Tharp Jr.

Soo Line Railroad d/b/a Canadian            ORAL ARGUMENT REQUESTED IF
Pacific Railway[1]                          COURT DEEMS NECESSARY

        Defendant.

---

### PLAINTIFF'S OBJECTIONS AND RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTER-STATEMENT OF FACTS

Pursuant to Rule 56 of the F*ederal Rules of Civil Procedure*, and to *Rule 56.1(b)* of the Local Rules of the United States District Court for the Northern District of Illinois, Plaintiff RAHMAN FOREMAN (hereinafter "FOREMAN"), by and through his attorneys, DELANEY LAW, PC, submit this Response to the Defendant's Statement of Material Facts in support of its Motion for Summary Judgment, together with Plaintiff's Statement of Additional Facts requiring the Denial of Summary Judgment.[2]

---

[1] The proper entity name of Defendant is Soo Line Railroad Company d/b/a Canadian Pacific.

[2] Consistent with the Rule 56 standard, Defendant does not concede the accuracy of any of Plaintiff's allegations except for purposes of this motion only, and expressly reserves all rights to challenge Plaintiff's allegations should this case not be fully disposed of by this motion.

## OBJECTIONS

Plaintiff objects to Defendant's Statement of Undisputed Material Facts ("UMF") on the following grounds.

1. Plaintiff objects to paragraphs 25, 42, and 73 of Defendant's UMF on the ground that the alleged facts in these paragraphs, lack foundation and are conclusory, not a statement of fact, and accordingly is not appropriately included in Defendant's Statement and does not require a response.

2. Plaintiff objects to paragraphs 7, 22, 23, 26-35, 68, and 71 of Defendant's UMF on the grounds that the alleged facts in these paragraphs, whether or not true, are not material to the resolution of Defendant's motion for summary judgment

## RESPONSES

1. Soo Line Railroad Company d/b/a Canadian Pacific ("CP") provides freight rail transportation services in Illinois and other Midwest states. It is largely unionized with its non-management employees represented by various labor unions and for which the terms and conditions of their employment are governed by collective bargaining agreements. (Declaration of Greta Bauer Reyes at Tab A at 140-42 (Foreman Deposition) (hereafter the Reyes Declaration shall be referred to as "Reyes Dec." and the Foreman Deposition transcript at Tab A of the Reyes Dec. as "Foreman Dep. p. __").

**RESPONSE: Admits.**

2. Foreman began his employment with CP on August 5, 2002. Foreman Dep. 22. He had no prior railroad experience and thus began his employment as a student conductor trainee.

Foreman Dep. 123. As discussed below, this involved a multi-month training program before starting to work as a conductor.

**RESPONSE: Admits.**

3.      Foreman went through a multi-month extensive training program as a trainee before starting to work as a conductor. Foreman 125. Such training consisted of both classroom and on-the-job training. Foreman 128. Foreman admits he is familiar with the General Code of Operating Rules ("GCOR") and Train & Engine Safety Rules. Foreman Dep. 128; 137. Foreman further recognizes and acknowledges that his knowledge and compliance with these rules are an essential function of his conductor position. Foreman 129; 138. These rules were part of his multi-month training program. Foreman 131; 138.

**RESPONSE: Admits.**

4.      Foreman admits the conductor position is a safety-sensitive position and is recognized as such by the Federal Railroad Administration ("FRA"). Foreman 125-126.

**RESPONSE: Admits.**

5.      Among the duties of the safety-sensitive position, conductors are responsible for monitoring of train movement for anything unusual that may happen and/or unusual obstacles that may affect the running of the train, assisting with mechanical malfunctions of the train while in route, inspection of freight cars, coupling air hoses, replacement of broken air hoses and gaskets, the coupling and uncoupling of cars and locomotives, climbing ladders on sides of cars to apply and release hand brakes, planning and performing set-outs and pick-ups, and the switching and service on line industries. Reyes Dec., Tab B. Conductors are also required to "read and understand general orders, track bulletins, and the General Code of Operating Rules" as part of their job. *Id.*

**RESPONSE: Admits.**

6.  Foreman admits that working as a conductor involves working in and around moving equipment. Foreman 126. He primarily worked as a yard conductor, which entails switching cars in and around a rail yard. Foreman 127. As between the engineer and the conductor, Foreman considers the conductor in charge of the crew. Foreman 130.

**RESPONSE: Admits.**

7.  Foreman further admits that CP is a 24/7 operation that requires timely and regular attendance of its conductors as an essential function. Foreman 128-129.

**RESPONSE: Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to those paragraphs by Plaintiff is required.**

**Subject thereto and without waiving said objection, should the Court consider this Paragraph Plaintiff admits its contents.**

8.  Foreman admits that aside from his probationary trainee period, he was a unionized employee throughout his employment with CP and that a collective bargaining agreement ("CBA") governed the terms and conditions of his employment. Foreman 129; 140141; Dittrich-Bigley Dec. Tab A. He acknowledges receiving a copy of the union contract upon starting with CP. Foreman 141. The CBA covers such contractual provisions as seniority, wages, benefits, and other terms and conditions of employment. Foreman 141-142.

**RESPONSE: Admits.**

9.  Foreman further acknowledges that one of the contractual guarantees afforded to covered employees like himself is the right to notice and a hearing before the imposition of formal discipline could be assessed. Foreman 144; Dittrich-Bigley Dec. ¶ 4. Foreman admits that such

process first required that he receive a hearing notice advising of the requirement to attend a hearing under the CBA. Foreman 145. He further recognizes and acknowledges that such notice was given because it was a contractual term of the CBA. *Id*. It was a written notice and not disciplinary. *Id*. Foreman further acknowledges that the CBA had certain time limits that required the written notice to be issued within a certain time frame. *Id*. 146.

**RESPONSE: Foreman admits these allegations, but further states that the hearing is required to be conducted by a fair and impartial hearing officer and not one that already knows that he is going to recommend termination. (*Exhibit 5:* Granfeldt 147:14-17; 275:24-276:6).**

10. The purpose of the formal hearing is to develop the facts regarding the incident and determine the employee's responsibility, if any, in connection with the incident in question. Dittrich-Bigley Dec. ¶ 4. Employees like Foreman can be represented at a formal hearing by a union representative, and have the opportunity to present their cases through testimony, exhibits, witnesses, and cross-examination. Dittrich-Bigley Dec. ¶ 4. Foreman 146147. Contractual time limits also exist following hearing to issue a decision.

**RESPONSE: Foreman admits everything except Foreman having the ability to call his own witnesses. Foreman acknowledges that he could introduce evidence at his hearing but believes he was only allowed to interact with whoever was formally charged in the letter. (*Exhibit 2:* Foreman 147:10-13; 147:23-148:3).**

11. The UTU CBA also affords employees covered by such agreement the opportunity to appeal any determination made pursuant to a formal hearing up to the highest designated officer on the property. Dittrich-Bigley Dec. ¶ 5. and Tab B thereto. Foreman admits he had this right under the CBA, and exercised it on multiple occasions including with respect to

his May 2014 dismissal.  Foreman 148-149. If an employee is not satisfied with the outcome of his/her appeal, the CBA permits him or her to further appeal the decision to a federal arbitration panel under the Railway Labor Act "RLA".  Dittrich-Bigley Dec. ¶ 5. As discussed further below, Foreman exercised his right to appeal his May 30, 2014 dismissal under the CBA and such appeal was denied by the Public Law Board that ultimately decided that appeal.  Dittrich-Bigley Dec. ¶ 9.

**RESPONSE: Admits.**

12.     At times, employees may also be given the opportunity to sign a waiver.  Dittrich-Bigley Dec. ¶ 6. In such situations, the waiver documents the employee executes explains the specific conditions of the waiver, which typically include that the employee acknowledges responsibility for the violation in question and further acknowledges his/her understanding that: (i) there will be no formal investigative hearing into the alleged violation; (ii) the discipline assessed will appear on the employee's record; (iii) no grievance or appeal can be taken from the discipline assessed and (iv) a copy of the executed waiver is placed in the employee's file.  See e.g Foreman Dep Ex. 38 (attached to Reyes Decl. Tab C); Dittrich-Bigley Decl. ¶ 6. Foreman is familiar with the waiver process under the CBA and admits he signed waivers on multiple occasions during his employment.  Foreman Dep. 149-151.  Foreman further understands that waivers could be offered, but were done at a manager's discretion.  *Id. 1*49-150.

**RESPONSE: Plaintiff admits these statements, but further states that Foreman only signed the waivers because it allowed him to keep his job. (Foreman 150:16-18).**

13.     Safety is the most important element in performing the duties of a conductor. Foreman 132. CP's overarching operational and safety rules are contained in the GCOR as well as other rules such as those contained in the Train & Engine Safety Rules book. Foreman 133; 136;

*see also* Reyes Dec., Tab D. Foreman admits his knowledge and compliance with these rules are essential to his conductor position, and that he was required to have a current copy and be familiar with the safety rules while on duty. Foreman Dep. 130; 133.

**RESPONSE: Admits.**

14. To ensure that conductors like Foreman understand their important safety role and CP's work rules, Foreman admits he was trained and tested on the rules. Foreman 131. As to the GCOR, he was further re-tested at repeated and regular intervals thereafter. Foreman 131. Foreman admits his training included training on both GCOR and the T&E safety rules. Foreman 137-138. Among other rules and testing requirements, conductors are required to pass the GCOR exam initially and biennially thereafter and to comply with the rules outlined therein. Foreman 138. Foreman acknowledges being required to have a copy of the rules to refer to while on duty. Foreman 133.

**RESPONSE: Admits.**

15. Conductors are also required to review and become familiar with any general orders that affect the subdivisions on which they work. Foreman Dep. 134-135. Conductors are responsible for reviewing the posted general orders at the beginning of each shift. Foreman Dep. 135. All the general orders that coincide with an employee's train operation for the day are posted on a bulletin board. Lenoir Dep. 17 (attached as Tab NN to the Reyes Dec.) Employees check the board every day to see if any things have changed. . . from one day to the next. *Id.* For instance, to find out if there are any new rules to be aware of, an employee would check the board. *Id.* at 18. As Mr. Lenoir testified in his deposition, ". . . as a conductor and engineer, you – every morning, you come in and check the bulletins." *Id.*

**RESPONSE: Foreman admits this paragraph and further states that Defendant made it difficult to actually do this as it refused to give employees adequate time to review the bulletin board. (Coleman 59:4-13).**

16.     In addition to the GCOR, CP implements other operational and safety rules. Foreman Dep. 137-38. One such set of rules, effective March 31, 2012, was the Safety Rule Book for Field Operations. Foreman Dep. 245. This set of rules applied to Mr. Foreman and he was required to comply with the safety rules set forth therein. Foreman Dep. 137-38.

**RESPONSE: Admits.**

17.     Rule T-8 within the March 31, 2012 Safety Rule Book for Field Operations is entitled "Crossing Over Rail Equipment." Foreman Dep. Ex. 17 (attached to the Reyes Dec. as Tab. E). That rule provided, among other prohibitions: "Do not cross over between coupled, moving cars." *Id.*

**RESPONSE: Admits.**

18.     On October 7, 2013, CP issued a general order (General Order No. A-40) which provided, in part, the following:

> **##Safety Rule Book for T&E dated May 2013 is in effect October 11, 2013 for all T&E employees superseding Safety book dated March 31, 2013. This book will be placed in the New General Operating Instructions (GOI) behind Chapter 13. Books are now available from your local supervisor.**

(bold and ## signs in original). Foreman Dep. 275; Foreman Dep. Ex. 45 (attached to the Reyes Dec. as Tab F).

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document.**

19.     The Safety Rule Book for T&E dated May 2013 was entitled "Train & Engine Safety Rule Book." Foreman Dep. Ex. 18 (attached to the Reyes Dec. as Tab G). The Train &

Engine Safety Rule Book dated May 2013 provided, in part, the following:

> \* \* \*
>
> 2. It is permissible to cross from one car to another car provided
> all of the following are met;
>   - Cars are coupled and stationary
>   - Three points of contact are maintained at all times
>   - Both cars have appropriate end crossover platforms and grab irons
> 3. The following is prohibited, do not cross:
>   - under equipment.
>   - **over or between coupled, moving cars; or**
>   - over or between cars without end platforms (e.g. multi-level autos).
> \* \* \*
>
> *Id.*

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document.**

20. Mr. Foreman was actively working on October 11, 2013 – the date the new rule book went into effect. Foreman Dep. 277-79; Reyes Dec. I.

**RESPONSE: Admits.**

21. In addition to the governing CBA, CP has also implemented various workplace policies. One such policy is the EEO Policy, which prohibits discrimination on a prohibited basis including on the basis of race, color, religion, national origin, sex, age, disability, protected veteran status, genetic information, or any other protected group under applicable law. Foreman Dep. Ex. 21 (attached to the Reyes Dec. as Tab H). The EEO policy also contains a clear prohibition against retaliation, which provides:

> Any act of retaliation taken against an individual making a complaint of discrimination under this policy, filing a charge of discrimination with a governmental agency, filing a discrimination lawsuit, participating in an investigation of a discrimination complaint, or otherwise opposing discrimination is strictly prohibited.

*Id.* at 8. The policy also contains an internal complaint procedure which provides the employee with multiple avenues to report concerns or about purported retaliation to CP. *Id.* at 7-8. Foreman acknowledges receiving this and other policies while at CP. Foreman Dep. 154; Foreman Dep. Ex. 20 (attached to the Reyes Dec. as Tab J ).

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document.**

22. Until mid-2013, CP maintained a Positive Behavior & Performance Development policy ("PB&PD policy") as CP's counseling and progressive discipline policy for unionized employees. (Foreman Dep. Ex. 22, Reyes Dec. at Tab K.) Foreman acknowledged his receipt of such policy when he began his employment in 2004. Foreman Dep 154; Foreman Dep. Ex. 20 (attached to Reyes Dec. at Tab J). Under the PB&PD policy, employees could receive informal and formal counseling to correct a problem, or, if warranted, receive progressive discipline pursuant to the policy and governing CBA. (Foreman Dep Ex. 22 (attached to the Reyes Dec. at Tab K). Informal coaching occurred when a "supervisor [became] aware of performance or behavior [issues]," in which case the supervisor would "promptly hold a private, face-to-face discussion with the employee." *Id.* at p 2. If informal coaching was ineffective or not sufficient, a supervisor could provide formal coaching as documented through a written Positive Action Plan ("PAP"). *Id.* at 2-3. While not disciplinary, a PAP indicates that an employee needed to work on specific issue(s), and if it was "not modified through informal or formal coaching and an employee continue[d] to demonstrate similar attitude, work performance or behavior problems the formal discipline process [would] be necessary to correct the behavior or job performance issue." *Id.* at 4.

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document. In addition, Plaintiff also points out this fact is immaterial as this policy was not in effect at the time of Foreman's hearing.**

23.     Discipline under the PB&PD policy was typically assessed in three progressive steps: (1) 5-calendar day suspension; (2) 10-calendar day suspension, and (3) dismissal. The policy also expressly provided, however, that "[n]ot all violations and/or offenses are appropriate for coaching and/or progressive discipline" and that, depending on the circumstances, CP could accelerate to immediate termination. Reyes Dec., Tab K.

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document. In addition, Plaintiff also points out this fact is immaterial as this policy was not in effect at the time of Foreman's hearing.**

24.     In March 2013, and as amended on June 15, 2013, CP adopted the "U.S. Discipline Policy" which replaced the PB&PD policy for employees like Foreman. Foreman Dep. Ex. 23 (attached to the Reyes Decl. at Tab L). Under such policy, discipline was assessed in a single stream and could progress with a 5-day suspension, 10-day suspension, 30-day suspension, followed by dismissal. *Id.,* pg. 1. As with the PB&PD policy, however, CP could skip steps or accelerate to termination depending on the facts and circumstances and particular rule violation. *Id*.

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the document.**

25.     A review of Foreman's employment record reveals that he had long history of counseling and discipline, including **<u>before</u>** any protected activity claimed here.

**RESPONSE: This paragraph should be stricken as inadmissible because the statement lacks**

foundation and is conclusory. *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) (conclusory statements, indications of opinion and speculation do not create genuine fact issue). Subject thereto and without waiving said objection Plaintiff states that he denies this statement as he had many years where he had no discipline whatsoever.

26. For instance, on March 16, 2004, Mr. Foreman was provided with formal counseling under the PB&PD policy, as documented through a Performance Action Plan ("PAP")[3] arising from Mr. Foreman improperly tying up train GH22 and continuing work on another assignment, resulting in overtime worked because Mr. Foreman did not have a proper understanding of the timeslip procedures. Foreman Dep. Ex 24 (attached to the Reyes Dec. as Tab M).

RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. (*See Exhibit 3*: Coleman 119:12-120:24 & *Exhibit 4:* Coleman Depo Ex. 3.). Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 10-years prior to his termination.

Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.

To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 10 years prior to his termination.

---

[3] Hereinafter, such formal counseling as documented through a PAP will be referred to as formal counseling in the subsequent bullets where applicable therein.

27.     On September 3, 2004, Mr. Foreman was issued a formal counseling arising from his actions which delayed the shift change on the 480, in addition to his being hard to reach on the radio. Foreman Dep., Ex. 25 (attached to the Reyes Dec. at Tab N).

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. *Id.* Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 9-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 9 years prior to his termination.**

28.     On September 29, 2004, Foreman received formal counseling arising from his failure to comply with instructions to provide a doctor's note within 72 hours of a layoff. Foreman Dep., Ex 26 (attached to the Reyes Dec. at Tab O.)

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. *Id.* Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 9-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 9 years prior to his termination.**

29.     On November 9, 2006 Mr. Foreman was issued a formal counseling arising from his reporting to work late on assignment #3881. Foreman Dep., Ex 27 (attached to the Reyes Dec. at Tab P.)

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. *Id.* Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 7-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 7 years prior to his termination.**

30.     On August 13, 2008 Mr. Foreman was issued a formal counseling arising from Mr. Foreman's failure to remove handbrakes on train 185-12, not properly watching/focusing on a student, and being late to work. Foreman Dep., Ex 28 (Reyes Dec., Tab Q.)

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. *Id.* Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 5-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 9 years prior to his termination.**

31.     On October 20, 2009, Mr. Foreman was issued a formal counseling arising from Mr. Foreman's act of sitting inside a vehicle while protecting a shove movement (in contravention of notices and rules regarding shove movements). Ex 29 to Foreman Dep. (Reyes Dec., Tab R.)

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. *Id.* Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 4-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling over 4 years prior to his termination.**

32.     On December 18, 2009 a courtesy letter was sent to the local chairman of Mr. Foreman's union notifying the union that he had missed a call for assignment GY11 0759 STRIP on November 26, 2009 at approximately 9:06 hours. The courtesy notice stated that any subsequent missed calls will be handled with the Behavioral System based on the employee's standing in the PB&PD policy. Ex 31 to Foreman Dep. (Reyes Dec., Tab S.)

**RESPONSE: Plaintiff states that Defendant has not alleged that a courtesy letter is discipline and Defendant has provided no cite to demonstrate that it is. Plaintiff further points out that this statement is immaterial as it relates to counseling that occurred more than 9-years prior to his termination.**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed.**

R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.

To the extent the Court deems a response is necessary Plaintiff states that he admits that a counseling letter was sent out more than 4 years prior to his termination.

33. On December 10, 2009, Mr. Foreman signed a 3 under the PB&PD policy accepting responsibility for his failure to follow procedures when he left without authority prior to the completion of duty, amounting to a violation of GCOR Rule 1.15. As a result, Mr. Foreman was assessed and served a 5-day actual suspension. Ex 30 to Foreman Dep. (Reyes Dec., Tab T.)

RESPONSE: Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1 due to the fact that the waiver was signed over four years prior to his termination. Therefore, this fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.

To the extent the Court deems a response is necessary Plaintiff admits he signed the waiver and further states Foreman only signed the waivers because it allowed him to keep his job. (Foreman 150:16-18).

34. On December 23, 2010, Mr. Foreman was assessed a 5-day actual suspension under the PB&PD policy following a hearing/investigation held pursuant to the applicable collective bargaining agreement where it was found that Mr. Foreman had violated Canadian Pacific General Code of Operating Rules 1.47: *Duties of Crew Members C: All Crew Members' Responsibilities*, Rule 6.28: *Movement on Other than Main Track* and 9.1.1 Canadian Pacific Timetable 7 *General Description of Signals; Stop.* In connection with his "failure to stop short of absolute signal

displaying stop at the east end of 5 lead, Bensenville Yard, at approximately 0930 hours . . .".[4] Ex 33 to Foreman Dep. (Reyes Dec., Tab U.)

**RESPONSE:  Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1 due to the fact that the discipline was assessed over four years prior to his termination.  Therefore, this fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff admits that he grieved this suspension and it was overturned (See Footnote 4 found in Defendant's Statement of Facts and below).**

35.     On April 17, 2013, Mr. Foreman was issued a formal counseling arising from an incident which took place on February 14, 2013 regarding Mr. Foreman's act of having his cell phone on his person while working. Ex. 34 to Foreman Dep. (Reyes Dec., Tab V.)

**RESPONSE: Plaintiff states that formal counseling *by its definition* is not discipline. (*See Exhibit* 3: Coleman 119:12-120:24 & *Exhibit 4:* Coleman Depo Ex. 3).**

**Therefore, Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1.  This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed.**

---

[4] Mr. Foreman was also assessed a 10-day actual suspension in April 2011 following a hearing held pursuant to the applicable collective bargaining agreement where it was found that Mr. Foreman had "violated General Code of Operating Rules 6.291 "Inspecting Passing Trains"" in connection with his failure to properly perform a roll-by while inspecting train G45-14 on Monday, March 14, 2011. However, Mr. Foreman's union appealed the suspension on Mr. Foreman's behalf and the grievance was sustained through the labor process.

**R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response is necessary Plaintiff states that he admits he received a non-disciplinary formal counseling.**

36.     On May 28, 2013, Mr. Foreman was assessed a 5-day actual suspension under the Discipline Policy following a hearing/investigation held pursuant to the applicable collective bargaining agreement where it was found that he had violated GCOR Rules 7.1 *Switching Safely and Efficiently*; 7.2 *Communication Between Crews Switching*; and 7.6 *Securing Cars or Engines* in connection with his failure to properly secure F19 track causing damage to rail equipment while working GH11-01 on April 1, 2013. (Ex 35 to Foreman Dep. (Reyes Dec., Tab W.)

**RESPONSE: Admits.**

37.     Also on May 28, 2013 Mr. Foreman was assessed a 30-day actual suspension[5] following a hearing/investigation held pursuant to the applicable collective bargaining agreement where it was found that he violated GCOR Rule 7.2 *Communication between Crews Switching* and 7.7 *Kicking and Dropping Cars* in connection with his failure to properly hold a job briefing resulting in unsafe switching conditions while working GH11 on April 22, 2013. Ex 37 to Foreman Dep. (Reyes Dec., Tab X.)

**RESPONSE: Admits.**

38.     Foreman alleges that he engaged in protected activity when he filed a charge of discrimination in 2011 and a federal lawsuit claiming race discrimination in 2012. Complaint

---

[5]   The 5-day and 30-day suspensions were assessed after separate hearings that both took place at different times on May 21, 2013. Postponements under the applicable collective bargaining agreement of both hearings, which were each originally noticed for earlier dates, caused the hearings to be rescheduled and both were ultimately held on May 21, 2013. Thereafter, Mr. Foreman's 5-day suspension and 30-day suspension were each issued by letter of the same date following the hearing.

18

Para. 15-16; Foreman Dep. Ex. 43 (attached to the Reyes Dec. as Tab Y); *see also* Foreman 35; 213-214.  On July 1, 2013, Foreman signed a confidential settlement agreement which among other terms included a full complete and global release of any claims which existed at the time of the signing of the agreement (Settlement Agreement and Release). Reyes Tab AA; Foreman Dep. 221-222.

**RESPONSE: Admits.  Foreman further states that Defendant did not sign the settlement agreement until November 2013. (Settlement Agreement and Release). Reyes Tab AA).**

39.    At the time Mr. Foreman signed the Settlement Agreement and Release in July of 2013, there was a pending hearing related to his failure to provide honest testimony at the second hearing held on Tuesday, May 21, 2013.  Foreman Dep. 219-220.

**RESPONSE: Admits.**

40.    On August 8, 2013, Mr. Foreman waived his CBA-entitled right to a hearing and acknowledged and accepted responsibility for his failure to provide honest testimony in the second hearing held on May 21, 2013.[6]  Foreman Dep. 212-213 Ex 38 to Foreman Dep. (Reyes Dec., Tab Z.)  He accepted yet another 30-day suspension for this violation of GCOR 1.6: Employees must not be: Dishonest.  *Id.*  Notably, Foreman acknowledges that dishonesty is an immediate terminable offense; and yet, he concedes that CP allowed him to sign a waiver and accept a 30-day suspension instead.  Foreman Dep. 292, 296.  He continued in his employment with CP.

---

[6]    As stated above, two hearings were held on this date. The hearing held at 13:30 hours, and regarding which Mr. Foreman later signed a waiver acknowledging that he had provided dishonest testimony, was that which involved Mr. Foreman's failure to properly hold a job briefing resulting in unsafe switching conditions on April 22, 2013, as noted above.

**RESPONSE: Foreman admits that he waived his right to a hearing and signed a waiver. Foreman further states Foreman only signed the waivers because it allowed him to keep his job. (*See Exhibit 2:* Foreman 150:16-18).**

41. On September 9, 2013, Foreman signed a "post-hearing release" through which he fully and globally released any and all claims of any nature, kind or type through his signing of the post-hearing release. Foreman Dep. 216-223 Foreman Dep. Ex. 40 (Reyes Dec., Tab AA.) As the release specifically provided, this included release of any claim related to the hearing, waiver of hearing and 30-day suspension assessed which he accepted by waiver dated August 8, 2013. Foreman Dep. 222; Reyes Tab AA (at pp. CP FOREMAN 1899-1902). Foreman admits he recognized that he was releasing any and all claims of any nature against CP through the date of his signing the post-hearing release on September 9, 2013. Foreman Dep 222.

**RESPONSE: Admits.**

42. As of 2014, Mr. Foreman stood at the last step of the disciplinary process, having last waived hearing and accepted a 30-day suspension on 8/9/2013 in connection with his failure to provide honest testimony at the May 21, 2013 hearing. Unfortunately, his performance deficiencies continued.

**RESPONSE: This paragraph should be stricken as inadmissible because the statement lacks foundation and is conclusory. *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) (conclusory statements, indications of opinion and speculation do not create genuine fact issue).**

**Should the Court deem a response is necessary Foreman admits that he waived his right to a hearing and signed a waiver. Foreman further states Foreman only signed the waivers because it allowed him to keep his job. (*See Exhibit 2:* Foreman 150:16-18). Foreman**

denies he had performance deficiencies. (*See Exhibit 2:* **Foreman 172:6-21; 194:2-195:5; 203:12-21; 207:5).**

43.     By letter dated January 28, 2014, Foreman –and two other employees –each received notice to attend a CBA hearing in connection with their alleged failure to properly line a switch causing damage to equipment while working their assignment on January 24, 2014. Foreman Dep. 223-225 Foreman Dep Ex. 41 (Reyes Dec. Tab BB.)     Rather than proceed to hearing, Foreman again acknowledged responsibility and accepted discipline for his failure to properly line a switch causing damage to equipment while working his assignment on January 24, 2014 which was in violation of GCOR 7.1 – Switching Safely and Efficiently. Ex 42 to Foreman Dep. (Reyes Dec., Tab CC.)     He signed the waiver on March 5, 2014 acknowledging responsibility and accepting a 30-day record suspension, 15 days actual time served.[7]  *Id.*  In signing the waiver, Foreman acknowledged his understanding that there would be no formal investigation hearing; the suspension would appear on his record as a suspension for cause; no grievance or appeals will be taken from the suspension and a copy of the waiver letter would be placed in his file.  *Id.*

**RESPONSE:  Foreman admits that he waived his right to hearing and signed a waiver.**

44.     Foreman fully concedes his admitted responsibility for the January 28, 2014 performance failure, stating that he "didn't line the switch for a car. Created a kaboom.  Yes, I did that . .  that was a mistake that I made that caused damage and ultimately did what I did, so there

---

[7]     A record suspension differs from a suspension with all actual days served in that a record suspension is documented in the employee's file as a suspension of a certain number of days, but the employee does not actually serve the entirety of the number of "record" days out of work. In this case, as noted above, Mr. Foreman was assessed a 30-day record suspension, but also served 15 actual days of that time period, and all of which he agreed to and accepted as part of the waiver.  .

is no getting around that." Foreman Dep. 226. Also, notably, Foreman already stood at the last step of the discipline process at this time given the 30-day suspensions Foreman had been assessed on May 28, 2013 and through the August 8, 2013 waiver he signed. *See* ¶¶ 37 and 40, above. Yet, rather than terminate his employment, CP allowed him to waive and accept another 30-day suspension in lieu of dismissal. Reyes Dec. Tab AA.

**RESPONSE: Admits.**

45.     By letter dated May 9, 2014 and pursuant to the contractual terms of the CBA, CP sent Mr. Foreman written notice that a formal hearing would be held for the purpose of ascertaining the facts and determining his responsibility, if any, in connection with his "alleged failure to follow safety procedures when crossing between equipment while working GW-15" on May 8, 2014. Foreman Dep. 237-238 Foreman Dep. Ex. 2 (attached to the Reyes Dec. at Tab DD.) The notice further advised Foreman he "may arrange for representation as provided under applicable provision of your labor agreement ***and to call witnesses to testify on your behalf***." *Id.* (emphasis added); *see also* Smith Dep. 108.

**RESPONSE: Plaintiff states the document speaks for itself and admits Defendant has correctly cited to the documents. Plaintiff denies that he had the ability to call witnesses to testify on his behalf. Foreman believes he was only allowed to interact with whoever was formally charged in the letter. (*See Exhibit 2:* Foreman 147:10-13; 147:23-148:7).**

46.     A formal hearing was held pursuant to the CBA on May 21, 2014. Foreman Dep. Ex. 3 (Reyes Dec. Tab EE.) Foreman attended the hearing, had union representation, had the opportunity to testify and his union representative could cross-examine witnesses in attendance. Foreman 237-238. The formal hearing transcript and other evidence revealed the following:

**RESPONSE: Plaintiff admits a formal hearing was held, that he attended with union representation, and testified on his own behalf. Foreman denies that his Union Representative had the full ability to cross-examine witnesses in attendance because when attempting to do so the hearing officer openly argued with Foreman's Union Representative, became sarcastic, arbitrarily and repeatedly interrupted Foreman's Union Representative's questioning of the witnesses, and often refused to allow Foreman's Union representative to ask questions. (*See Exhibit 5:* Granfeldt 214:17-25; 204:2-8; *See also Exhibit 6:* Hearing Transcript: 20:16-22:25; 23:20-24:26; 39:5-43:6).**

47. On May 8, 2014 Trainmaster Carlos Feliciano was performing efficiency tests out in the Bensenville yard, including an efficiency test of Foreman and his crew. Reyes Tab EE at pp. 4; 6. Specifically, Feliciano intended to observe and test the performance of Foreman and his crew's (this included Foreman and his helper) on shoving movements on the train GW-15. *Id.* at pp. 10; 16.

**RESPONSE: Denied. Feliciano testified that he did not complete any efficiency tests that day. (*See Exhibit 8:* Feliciano 205:2-9). Nor did Feliciano enter any tests into the CAM system. (*See Exhibit 8:* Feliciano 104:17-20).**

48. Feliciano was in his vehicle on a roadway to the south of the C-yard lead track, at a point called the King Switch, which is three or four rail car lengths east of a crossing near the C-yard. Reyes Tab EE at pp. 8-10. While at the King Switch, Mr. Feliciano observed a cut of cars from the GW-15 shoving in to the C-yard. *Id.* pp. 4; 8.

**RESPONSE: Plaintiff admits that Feliciano testified as to such at the hearing.**

49. As the cars were passing the King Switch, Mr. Feliciano observed Foreman riding a tank car. Reyes Tab EE at pp. 5; 8-9. At the time Mr. Feliciano observed Foreman, he was on the

south side of the tank car. *Id.* at pp. 11. As part of the efficiency test, Mr. Feliciano intended to speak to Foreman regarding the way he had been riding the tank car. T. 10; 16. Thus, Mr. Feliciano began to drive east along the south side of the track in order intercept Mr. Foreman and speak with him. *Id.* at 12; 14-15.

**RESPONSE: Plaintiff admits that Feliciano testified as to such at the hearing.**

50.     At a certain point, Mr. Feliciano lost sight of Foreman on the south side. Reyes Tab EE at pp. 15. He waited for the engine to clear the crossing, and then crossed over and proceeded east again on the north side of the track toward the C-yard. *Id.* at 14-15. After Mr. Feliciano drove around to the north side, he actually observed Foreman on the *north* side of the tracks. T. 12. At this point, the entire cut of cars, including the engine, had passed through the crossing and was still moving. *Id.* at 12; 15. Indeed, Mr. Feliciano's recollection is unwavering that at the time he observed Mr. Foreman riding the car, the cars were in motion and that at no point after that did the cut of cars stop moving. *Id.* at 11-12; 14; 15; 28-29. Mr. Feliciano stopped his vehicle and Foreman approached him. *Id.* at 13.

**RESPONSE: Plaintiff admits that Feliciano testified as to such at the hearing. However, Feliciano also testified that he was monitoring a radio that he inadvertently turned to the wrong station and had to turn back to the radio station Foreman and his crew were on. He had no idea whether or not Foreman issued a stop order on his train during that period. *See Exhibit 8:* Feliciano 132:1-25. Furthermore, Foreman testified that he stopped the train when he crossed over. (*See Exhibit 2* Foreman 255:10-257:1; *See Also Exhibit 6 Hearing Transcript 26:23-27:24.*)**

51.     Mr. Feliciano and Foreman then engaged in a conversation. Mr. Feliciano and Foreman agree that Mr. Feliciano first asked Mr. Foreman how he had gotten from the south side of the train to the north side. Reyes Tab EE at 17; Foreman Dep. 258. Mr. Foreman and Mr. Feliciano also agree that Foreman simply stated to Mr. Feliciano that he had to cross the train. *Id.*

**RESPONSE:  Admits.**

52.     Mr. Feliciano reports that he then stated to Foreman that crossing through moving cars was not allowed, and that Foreman responded that he believed he was allowed to cross between moving equipment. Reyes Tab EE at 5; 16; 18.   Thus, by Mr. Feliciano's recollection, Foreman admitted to having crossed through the moving equipment. *Id.* at 18; 46.

**RESPONSE: Denied.  Plaintiff never told Feliciano that he crossed between moving cars or that crossing between moving cars was allowed. *See Exhibit 6 Hearing Transcript* 26:23-27:24).**

53.     At the hearing, Foreman admitted that Mr. Feliciano asked him how he could go from the south side to the north side of the train, and even admits that he told Mr. Feliciano that he simply crossed the car. Reyes Tab EE at pp. 25-26. Foreman maintained, however, for the first time at hearing that the cars were not in motion at the time he crossed. *Id.* at 26-27.

**RESPONSE: Denied.  Plaintiff never told Feliciano that he crossed between moving cars or that crossing between moving cars was allowed.  (Hearing Transcript 26:24-26).  Foreman adds that the hearing was the only time he was afforded an opportunity to give his version of the events. He was not asked to give a statement following the supposed incident as is procedure with alleged rule violations.  (Cork 25:6-22).**

54.     John Granfeldt served as the hearing officer for the May 21, 2014 hearing.  Reyes Tab EE. Following the hearing and upon review of the transcript, Granfeldt prepared a summary

of his findings from his review.  Granfeldt Dep. Ex. 3; Smith Dep. Ex 7 (Reyes Decl. Tab GG.)

Specifically, he found that Foreman had violated Train & Engine Rule Book May 2013 Safety

Rule T-8 Crossing Between Moving Equipment and that the testimony from trainmaster Feliciano

supported this conclusion.  *Id.*  He documented his summary and conclusions in a contemporaneous

email and provided it to Superintendent Brandon Smith and General Manager Mark Redd on May

28, 2014.  *Id.*  Granfeldt's summary also included review of Foreman's standing in the discipline

process and advised that Foreman stood for termination under that process.  *Id.*  His

recommendation was therefore for termination based on that standing.  *Id.*

**RESPONSE:  Plaintiff admits Granfeldt served as the hearing officer.  Plaintiff denies that**

**Granfeldt prepared a summary of his findings, rather Granfeldt simply stated that**

**Feliciano's testimony, (without detailing what testimony he specifically referred to),**

**supported the charges. Plaintiff denies that Granfeldt "reviewed" Foreman's standing in the**

**discipline process, rather he testified he looked at one report. (*See Exhibit 5:* Granfeldt**

**236:12-237:25; *See Also Exhibit 6*.**

55.     As Granfeldt explained at his deposition:

Mr. Feliciano's testimony was very believable, that he was in a position to watch the
movement the whole time, albeit he that he wasn't on a radio channel played no bearing
on it, that he had observation of the movement the whole time, observed Mr. Foreman on
the south side, and once the movement cleared, he was able to come across the track, drive
east, and see that Mr. Foreman was now on the north side.  That was the most believable
part of the whole investigation.  Whether he saw him go through or not was irrelevant.
There was no possible way that he could get from the south side to the north side without
going through the – the equipment.  So basically, on that testimony, I concluded that there
was a violation in the safety rule.

Granfeldt Dep. 257-58 (attached as Tab MM to the Reyes Dec.) Granfeldt further explained that

he is personally familiar with that area of the Bensenville yard – having spent at least 10 years

working in Bensenville and is very familiar with that area. "It's unobstructed view, familiar with the crossing that he used, yes." Granfeldt Dep. 258-59.

**RESPONSE: Plaintiff admits this was Granfeldt's deposition testimony, but denies that inferences therein. Foreman testified the train was stopped and that Granfeldt refused to obtain information that would corroborate Foreman's testimony. (*See Exhibit 2:* Foreman 247:4-6).**

56.     Following the hearing officer review, Superintendent Brandon Smith then reviewed the hearing record and likewise concluded that the record established Mr. Foreman's violation of the safety rule in question.  Smith Dep. Exh. 7 (Reyes Dec. Tab GG.); Smith Dep.

122-124. (attached to the Reyes Dec. Tab HH.)  As Smith explained in his deposition:

> The consistency in Mr. Feliciano's testimony was consistent the whole way. Mr. – Mr. Foreman's, however, in different angles that they had taken throughout the investigation led me to believe that – that there was inconsistency in two or three different directions throughout the investigation hearing. One, that, you know, the train had stopped.  Initially the conversation was about he had – it was a rule violation that he didn't know was a rule which changed to the train was stopped, so I could walk through it. So I went through that process and just understood the consistency of it and applied the facts after that.

Smith Dep. 127. As Smith further explained:

> Reading the transcript, it was consistent in Mr. Feliciano's testimony that he was in a position or had moved throughout his course of that situation in a position that he would always have had understanding no matter what he was doing if a movement was moving or not moving, and he was consistent from start to finish.  And his vantage point just knowing the yard and how the yard's laid out, he would have – he would have not had anything to distort his view. There's no structures of any – of any kind to distort what he would be seeing or hearing in some cases.

*Id.* at 128.

**RESPONSE: Plaintiff admits this was Smith's testimony at his deposition, but denies that inferences therein. Foreman testified the train was stopped and that Granfeldt refused to**

obtain information that would corroborate Foreman's testimony. (**See Exhibit 6: Hearing Transcript 26:24-26**).

57. As Smith's email also reveals, he also considered the various purported defenses Foreman sought to raise at the hearing through his union. However, upon consideration and review of the strongest of these arguments, Smith concluded it was without merit. As he wrote in a contemporaneous email to Mr. Redd at the time:

> There are several defenses that were communicated by the Union on behalf of Mr. Foreman, the most legit being the change in US Safety Handbook last year. Their defense was predicated upon his unknowing knowledge of the change, though this is null and void due to the fact that this rule never changed.

Smith Dep. Ex. 7 (Reyes Dec. Tab GG).

**RESPONSE: Plaintiff admits this was Smith's testimony at his deposition, but denies that inferences therein. Foreman testified the train was stopped and that Granfeldt refused to obtain information that would corroborate Foreman's testimony. (*See Exhibit 2:* Foreman 247:4-6).**

58. Smith also confirmed that Foreman "does stand for dismissal and that this matter substantiates his continued in adherence to company, rules, regulations and policies." Smith Dep. Ex. 7 (Reyes Dec. Tab GG.) In reaching this conclusion, Smith explained that he reviewed the employee profile as well as other personnel records. Smith Dep. 127-128; 130-132. For instance, he reviewed a waiver Foreman signed on August 9, 2013 in which he admitted failing to provide honest testimony in a hearing. *Id.* at 127. Smith explained this played a role in his recommendation. Smith Dep. 127-128. Smith also confirmed the discipline assessed through the 8.9.13 waiver was a 30-day suspension. *Id.* at 130-132.

**RESPONSE: Foreman admits this was Smith's testimony at his deposition.**

59.     The record further showed that Foreman signed an additional waiver on March 4, 2014 accepting responsibility and another 30-day suspension for his failure to properly line switch causing damage to equipment while working the GH11 on January 24, 2014.  Smith Dep. At 133-137.  As Smith observed, the additional 30-day suspensions Foreman received during this time period were outside the policy and gave Foreman "more chances."  *Id.* at 138.

**RESPONSE:  Foreman admits that he waived his right to hearing and signed a waiver.**

60.     Smith made recommendation for dismissal as Foreman clearly stood at the termination level.  Smith Dep. 138.

**RESPONSE:  Plaintiff admits this was Smith's testimony at his deposition, but denies that inferences therein.**

61.     This email chain, which included a multi-level review process which began with the hearing officer's review and findings, followed by the review and summary from Mr. Smith, was then forwarded to Mark Redd, General Manager Operations, U.S. West Region. Mr. Redd reviewed the hearing record prepared from the May 21, 2014 hearing held in connection with Mr. Foreman's alleged rule violation on May 8, 2014. Redd Dec. ¶ 5. The email chain also noted that Mr. Foreman was at the last step of the discipline process. *Id.*

**RESPONSE: Plaintiff denies that the email chain included a multi-level "review". Granfeldt simply stated that Feliciano's testimony, (without detailing what testimony he specifically referred to), supported the charges and everyone else concurred. Plaintiff denies that Granfeldt "reviewed" Foreman's standing in the discipline process, rather he testified he looked at one report. (*See Exhibit 5:* Granfeldt 236:12-237:25; *See Also Exhibit 7:* Granfeldt Dep. Ex. 3.**

62.     Based on the facts and evidence from the hearing, which established Mr. Foreman's violation of Train & Engine Safety Rule Book T-8 Crossing Over or Between Equipment and in consideration of Mr. Foreman's past discipline history and his standing at the dismissal step, Mr. Redd determined that dismissal was appropriate. Redd Dec. ¶ 6.

**RESPONSE:  Plaintiff admits Redd states this in his declaration, but denies that the hearing established a violation of the of Train & Engine Safety Rule Book T-8 Crossing Over or Between Equipment.** *See Generally Exhibit 6.*

63.     In his capacity as General Manager Operations, US West Region, Redd made the decision to approve Mr. Foreman's discharge from employment. Redd Dec. ¶ 5.

**RESPONSE:  Admits.**

64.     Following the multi-level review, Foreman was advised by letter dated May 30, 2014 that review of the record established his violation of Train and Engine Safety Rule Book T8 Crossing Over or Between Equipment. Foreman Dep. Ex. 6 (Foreman Dep Exh. 6) (attached to the Reyes Dec. as Ex. II.) and notified he was dismissed from service.

**RESPONSE:  Plaintiff denies there was a true multi-level review prior to his termination. Plaintiff admits he was terminated by letter dated May 30, 2014.**

65.     Mr. Redd began his employment with CP on October 7, 2013 as General Manager Operations U.S. West Region.  Redd Decl 2.  He officed out of St Paul, MN.  Redd was unaware that Mr. Foreman had filed a race discrimination charge with the EEOC in 2011 and was also unaware that he had filed a federal court complaint alleging race discrimination in July 2012. Indeed, both of these events predate Mr. Redd's employment with CP, which began in October 2013. Redd Dec. ¶¶ 3; 7. Further, when Mr. Redd began his employment with CP, he was located out of St. Paul, Minnesota. While Mr. Redd had responsibility for train and engine operations in

Bensenville, Illinois, at the time of Mr. Foreman's dismissal from employment on May 30, 2014, Mr. Redd's office location continued to be in St. Paul, Minnesota.

**RESPONSE: Plaintiff admits this information is contained in Redd's Declaration.**

66. As noted above, Foreman appealed his dismissal under the CBA by letter dated August 26, 2014. Foreman Dep. Ex. 7 (attached to the Dittrich-Bigley Dec. as Tab B); Dittrich-Bigley Dec. ¶ 7. CP denied the appeal by letter dated November 21, 2014. Foreman Dep. Ex. 8 (attached to the Dittrich-Bigley Dec. as Tab C); Dittrich-Bigley Dec. ¶ 8.

**RESPONSE: Admits.**

67. Foreman's appeal was then listed and heard before a 3-member public law board ("PLB"). By award dated September 21, 2016, the PLB denied Mr. Foreman's claim and upheld his dismissal. Dittrich-Bigley Dec. ¶ 9; Foreman Dep. Ex. 12 (attached to the Dittrich-Bigley Dec. as Tab D.) In so doing, the PLB first reviewed the procedural arguments raised by the Organization (Union), but found them to be "without merit." *Id.* 2. It further stated that: "The record reveals that the Claimant was guaranteed all of his due process rights throughout the hearing and investigation." The PLB further found that upon its review of the evidence and testimony in the case, "there is sufficient evidence in the record to support the finding that [Foreman] failed to follow safety procedures when he was seen crossing between moving equipment." *Id.* at 2. Having found the violation supported by substantial evidence, the PLB proceeded to consider the type of discipline imposed and, in this regard, also found the decision to dismiss supported by the record. Indeed, the PLB made these findings concerning Mr. Foreman's discipline record:

> The Claimant [Foreman's] discipline record is very poor. IT shows that he had several suspension, including a 10-day suspension, a five-day suspension, and two thirty-day suspensions in the year 2013, as well as a fifteen day suspension in the year 2014, for violations of Carrier rules. Given that poor disciplinary background, as well as the seriousness of the offense of which he was properly found guilty in this case, this Board

cannot find that the Carrier's action in terminating [Foreman]'s employment "was unreasonable, arbitrary, or capricious.

*Id.* at p. 3.

**RESPONSE: Foreman states that the document speaks for itself and admits Defendant has correctly cited to the document.**

68. On or about January 6, 2015, Foreman filed a charge with the EEOC challenging his May 3[0], 2014 discharge, claiming it was in retaliation in violation of Title VII for his filing a charge of discrimination (in 2011) and federal lawsuit (in 2012) for race discrimination. Complaint (Foreman Dep Ex. 43); Foreman Dep. Ex. 49 (attached to the Reyes Dec. as Tab JJ and Reyes Dec. as Tab II, respectively.) Foreman admits the only date he identified was his dismissal date and further admits he did not check the box for "continuing action." Foreman Dep. 305-308. The EEOC investigated the matter, after which it informed Foreman through his counsel that "[b]ased on the evidence available, it does not appear that EEOC will be able to establish that a violation under Title VII of the Civil Rights Act of 1974, as amended (Title VII) has occurred." Dep exhibit 50 Foreman (Reyes Declaration Tab KK.) The EEOC thereafter dismissed Foreman's EEOC charge on January 4, 2016. Foreman Dep Ex 51, Reyes Decl. Tab LL.

**RESPONSE: Plaintiff objects to this Paragraph as the alleged fact that the EEOC investigated the matter and found no violation it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response necessary Plaintiff admits he filed an EEOC complaint and the EEOC granted Foreman his right to sue.**

69.     Foreman filed the Complaint in this lawsuit on April 1, 2016. Reyes Tab Y. Therein, he argues that he was off on paternity leave for 3 months and that CP failed to provide him with a copy of the new safety handbooks. Complaint, ¶ 16(a). The record evidence shows, however, that Foreman was not in the midst of a three-month paternity leave on October 7, 2013 - the day the general order announcing the new rule book went into effect. Foreman Dep. 275. Indeed, Mr. Foreman's paternity leave extended from February 1 through February 20, 2014, Foreman Dep. 263, and the new safety handbook, was announced through a general order dated October 7, 2013 – about 4 months prior to Mr. Foreman going out on paternity leave.  Foreman Dep. 275.

**RESPONSE: Admits.**

70.     As set forth above, Mr. Foreman was actively working on October 11, 2013 - the exact date the 2013 safety handbook went into effect. (See ¶ 20, above.)

**RESPONSE: Admits.**

71.     CP has disciplined other employees for crossing between moving equipment in violation of T&E Rule T-8 and who did not engage in protected activity.  For example, following a CBA hearing held on July 29, 2015, employee Lenoir was assessed a 30-day actual suspension for violation of CP's Train & Engine Safety Rule Book T-8 – Crossing Over or Between Equipment, as well as GCOR 1.1 – Safety. Dittrich-Bigley Dec. Tab E and Dittrich-Bigley Dec. Tab F.  The 30-day suspension was commensurate with this employee's standing in the disciplinary process. Perkins Dec. ¶ 4.  Mr. Lenoir has never experienced any racial harassment in the workplace at CP; never experienced or witnessed any type of retaliation in the workplace at CP and has never filed a race discrimination or retaliation complaint against CP in his 15-plus year career at CP.  Lenoir Dep. 18-19; 21-22.

**RESPONSE: Plaintiff objects to this Paragraph as it is not a material fact in violation of Rule 56.1. This fact does not have any bearing on the outcome of this suit under applicable law. Since Plaintiff must identify genuine issues only with respect to "material" facts, Fed. R. Civ. P. 56(c), (f); Local Rule 56.1, no response to this paragraph by Plaintiff is required.**

**To the extent the Court deems a response necessary Plaintiff admits this was Lenoir's testimony.**

72. Of the other two plaintiffs who, like Foreman, were also current employees who engaged in protected activity in filing the federal race discrimination complaint in 2012, Mr. Coleman remains a current employee to this day and with 19 years of service for the company. Coleman Deposition 147-149. Mr. Lane, for his part, successfully retired from CP in and around 2015 with full retirement and over 41 years of total service with CP. Coleman 147, 155; Perkins Decl ¶ 3.

**RESPONSE: Plaintiff admits Mr. Coleman remains a current employee, but affirmatively states that Mr. Coleman testified to experiencing ongoing issues with discrimination. *(See Exhibit 3:* Coleman Deposition 47:7-14). Plaintiff admits Perkins' declaration states that Mr. Lane successfully retired.**

73. Foreman's only other "evidence" he purports to advance in support of his retaliation claim consists of conclusory, irrelevant and/or speculative allegations. Foreman claims, for instance, that African-American employees are treated more harshly than whites, however, he *admits* it is all "shanty talk" and based on "third-hand, fifth-hand" information. Foreman 286-287; 295 ("I can point to other people, but it's third-party information."). Moreover, while he advances this argument in conclusory fashion (and admitting in the course of doing so that it's based only on hearsay), CP's treatment of Foreman concerning disciplinary events in 2013 undisputedly belie any

retaliatory inference. Indeed, it's Foreman's view and understanding that waivers are granted at a manager's discretion. And yet, here, in 2013 - and closer in time to Foreman's protected activity, CP allowed Foreman to sign a 30-day waiver in lieu of termination. Foreman 296 ("Q: So here is an incident where the company allowed you to sign that waiver, correct? A: Uh-huh. Q: And as a result you were not terminated, correct? A: Correct.").

**RESPONSE: This paragraph should be stricken as inadmissible because the statement lacks foundation and is conclusory. *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) (conclusory statements, indications of opinion and speculation do not create genuine fact issue). Subject thereto and without waiving said objection Plaintiff states that he that he can identify specific African American employees of Soo Line that are experiencing ongoing discrimination. (Coleman 47:7-14). Foreman further states Foreman only signed the waivers in order to avoid being terminated, "in order to keep your job, you do what you do." (*See Exhibit 2:* Foreman 150:16-18).**

74. He also claims he had a clean record of discipline, Foreman at 291, yet, the undisputed record reveals differently (see summary of Foreman's prior counseling and discipline history above).

**RESPONSE: Denied. Plaintiff had a clean disciplinary record until 2009 when he received two five-day suspensions. (*See Exhibit 9:* Foreman Dep Ex. 30). The only other discipline in Foreman's file comes three years later following his first discrimination complaint. (*See Exhibit 10:* Foreman Dep Ex 35; *See Exhibit 11:* Foreman Dep Ex 37). Under these circumstances, it was entirely accurate to say Foreman had a reasonably clean disciplinary record prior to protected activities in 2012.**

75.      Any reliance by Foreman on the hazardous condition reports he submitted carries no legal import as it relates to this retaliation matter under Title VII.  The letter he wrote relates entirely to a separate and independent issue of what Foreman perceived to be hazard conditions in the two yards, *id.* 301 and, as Foreman admits, there is nothing in either report that make mention or refer to Mr. Foreman's 2012 federal race discrimination complaint nor reference race anywhere in them.   Id 301.   Further, the letter Foreman provided to Johnson (attaching the 2 alleged hazardous condition reports) was admittedly written by Foreman on May 13, 2014 - *after* he had already been noticed to attend a CBA hearing for the alleged T-8 rule violation.

**RESPONSE:  Admits.**

Dated: September 14, 2017                          By:  /S/  Cynthia M Rote
                                                                Cynthia M. Rote



Delaney Law, PC
Firm No.: 44350.
444 N. Wabash Ave., Ste. 300
Chicago, Illinois 60611
(312) 276-0263